**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Criminal No. 05-386 (ESH)** |
| | : | |
| **v.** | : | |
| | : | |
| **DEMETRIS JOHNSON,** | : | |
| **Defendant.** | : | |
| | : | |

**GOVERNMENT'S SUPPLEMENTAL OPPOSITION TO DEFENDANT'S**
**MOTION FOR MODIFICATION OF CONDITIONS OF RELEASE**

The United States, by its counsel, the United States Attorney for the District of Columbia,

respectfully opposes the defendant's motion to modify his conditions of release.  The government

relies upon the following arguments, points and authorities, and on any others which may be

made at a hearing on this matter.

**FACTUAL BACKGROUND**

The defendant stand before this Honorable Court, charged with Conspiracy to Distribute

and to Possess with the Intent to Distribute 5 Kilograms or More of Cocaine, and 50 Grams or

More of Cocaine Base.  This charge arises out of a long-term narcotics-trafficking investigation

being conducted by the joint FBI/MPD Safe Streets Task Force.  In 2004, various confidential

sources began telling law enforcement that Antoine Jones, who operated the nightclub Levels, in

Northeast, Washington, D.C., was distributing multiple-kilogram quantities of cocaine to several

customers in the greater Washington, D.C., area, frequently using his club Levels as a base of

operations.  Various techniques were employed by law enforcement to investigate Jones's illicit

activities, including in person and video surveillance, review of pen register data, interviews of

additional confidential sources and witnesses, a review of available subscriber information and

pen-register data, a review of stored text-messages on the cellular telephones of Antoine Jones

and his right-hand associate, Lawrence Maynard, obtained via search warrant, and ultimately a

Title III wire interception on Antoine Jones's cellular telephone, which ran from September 2,

2005, through the date that these defendants were arrested, October 24, 2005.

Information regarding from these confidential sources was further corroborated by a

traffic stop of Lawrence Maynard on April 5, 2005.  The Highway Interdiction Unit of the

Durham, North Carolina Police Department conducted a traffic stop of a 1997 Honda Odyssey

mini-van bearing Maryland tags 273M195, operated by Lawrence Maynard. and also occupied by

another individual in the vehicle front passenger seat.  Their investigation revealed that this car

was registered to Antoine Jones, with a date of birth of February 25, 1960, and to one of his

residences, 12221 Brandywine Road, Brandywine, Maryland.  In the course of further

investigation, the interdiction unit canine alerted on the right rear passenger area of the mini-van.

A search of the mini-van revealed a hidden compartment in the van, which contained six white

plastic Target shopping bags, containing a total of $67,115.00 in U.S. currency, in various

denominations, held together by rubber bands.  When interviewed by the Interdiction Unit, both

Maynard and his passenger denied any knowledge of the secret compartment and the money

contained therein.  The Honda Odyssey was impounded, the $67,115.00, was seized as evidence,

Maynard received a warning ticket, and then was released without additional charges.

Throughout the course of the investigation prior to the wire interception, several members

of Jones's organization were identified, including Lawrence Maynard, who is both the

nightclub's manager, and Jones's right-hand man in the drug-trafficking business, and Donald

Hunter, who was a customer.  In the course of the approximately 50 days of wire interception,

other of Jones's customers were identified through telephone toll records, and license plate

numbers, and surveillance.  Among those customers was Demetris Johnson.

As set forth in far greater detail in the attached factual proffer, from the very early days of the wire interception, a clear pattern of telephone contacts was established between Jones and various individuals, whom investigators identified over time.  In those calls, Jones and his colleagues discussed the timing and location of meetings, without any other substantive discussion.  This pattern is consistent with what confidential sources indicated was his practice: short conversations setting up meetings to drop off money and pick up cocaine, without any further discussion on the telephone, for fear of being intercepted by law enforcement.  Further, several common meeting places were discussed between Jones and his various customers, including commercial establishments along Branch Avenue in Maryland, and at the nightclub Levels.

Jones also uniformly spoke in code throughout the interception period.  For example, he and his drug-trafficking colleagues speak frequently of the need for, and delivery of, "tickets," which was a reference to wholesale quantities of cocaine, perhaps kilograms.  They spoke, too, of "VIP tickets" (larger quantities), and occasionally of "flyers."  While also consistent with nightclub business - and thus a good cover - the conversations fairly quickly became obviously a code, based on, among other things, the occasional slip-up, e.g., a request by a customer for a "half ticket," or a query by Jones of Johnson as to whether he still needed "that little ticket."  Also, there were occasions when Jones's supply of "tickets" was obviously getting low, and when he was scrambling to redistribute them to other customers.  For example, on one occasion, September 13, 2005, after speaking with another customer, John Adams about what he needed, Jones called Johnson and left a message saying that he needed "those two tickets back."  Jones

then called Adams back and told him that he thought that "Youngin" (a reference to Johnson) had already sold some of his "tickets," and then continued to discuss with Adams how many tickets various people have and need.  Similarly, towards the end of the interception period, Jones told Johnson that he was trying to save some of those tickets for Johnson.

Within the first few weeks of the wire interception, it further became obvious that Jones was being supplied by Hispanic-sounding males, with cellular telephone exchanges in McAllen, Texas, a major point-of-entry of cocaine into the United States, and Irvine, California. Throughout the course of the interception period, Jones spoke with at least three different Hispanic-sounding males - which investigators confirmed through pen register data were all in contact with each other - about the timing of shipments of "tickets," "music," and other references to cocaine.  Based on the content of some of these calls, and surveillance of Jones, investigators discerned that Jones was meeting with frequency with one of these men at a stash location in Ft. Washington, Maryland.  Based on surveillance photos, investigators have determined that that male is co-defendant Roel Bremea, Jr.

Based on telephone conversations during the third week in October, 2005, in which Jones discussed with the McAllen-based Hispanic male the fact that the "party" would happen on "Friday," (October 21, 2005), investigators obtained numerous search warrants for the residences of some suspected customers, along with Jones's two residences, the nightclub Levels, and the suspected stash house located at 9508 Potomac Drive, Ft. Washington, Maryland.  In the early morning hours of October 24, 2005, teams of agents executed those search warrants and recovered approximately 97 kilograms of cocaine, three kilograms of crack cocaine, and in excess of $800,000.00, from the stash house alone.  Arrested at that location were defendants

4

Bremea, Alberto Rollando Carrillo-Montelongo, and Ricardo Sanchez-Gonzales. Also recovered from various other search locations were smaller, still-wholesale quantities of cocaine, crack cocaine, large amounts of cash, and several weapons. Recovered from Jones's Jeep was in excess of $69,000.00 in cash. Recovered from the residence of Demetris Johnson was one-half kilogram of cocaine, $12,000.00, in cash, ziplock baggies, a digital scale, and a small amount of marijuana. Recovered from the nightclub Levels, of which Maynard is the manager, was a loaded, stolen .9mm handgun, from the drawer of a desk in the office. Defendant Johnson was arrested on the day of the searches, along with the co-defendants in the initial indictment. Defendant Maynard was indicted in a separate companion indictment, and arrested on November 23, 2005.

## **PROCEDURAL HISTORY**

When the case of defendant Johnson was presented to Magistrate Judge Deborah Robinson on October 28, 2005, she held him without bond pursuant to 21 U.S.C. § 3142(e), finding that no combination of conditions of release would reasonably assure the safety of the community. The defendant filed his bond review motion on December 19, 2005, and the government responded that same day. At a hearing that afternoon, this Court asked the government to provide more detail regarding the case against Johnson, which is now set forth above.

## **ARGUMENT**

As an initial matter, defendant Johnson has been indicted for an offense in violation of the Controlled Substances Act, which triggers a rebuttable presumption in favor of detention.  Because the defendant, either at the detention hearing or in his pleading, has failed to articulate facts to overcome such a presumption, detention is the only viable placement for him pre-trial.

Further, to reiterate the argument advanced by the government at the detention hearing, this defendant is charged with a dangerous drug offense.  This conspiracy is charged with distributing an enormous amount of cocaine; indeed, taken from the organizations's stash house were 97 kilograms of cocaine and 3 kilograms of cocaine base, along with in excess of $800,000 in cash.  This is no small drug operation, but rather a wide-ranging multi-jurisdictional drug-trafficking operation, with direct links to Mexican suppliers.  Those facts standing alone justify the orders of detention - as the Magistrate Judge found.  Further, the strength of the evidence against the defendant is compelling, including numerous wire interceptions clearly indicative of drug trafficking, which corroborates information provided by confidential sources.  Finally, defendant Johnson was found in possession of contraband and a large sum of money, which further evidences his links to this large-scale drug-trafficking operation.

Against these facts, the defendant relies on community ties to overcome the presumption that he should be detained pending trial.  The framers of the 1984 Bail Reform Act felt differently.  "The Committee also notes with respect to the fact of community ties that it is aware of the growing evidence that the presence of this factor does not necessarily reflect a likelihood of appearance, and **has no correlation with the question of the safety of the community."**

S.Rep. No. 225, 98th Cong., 2d Sess. 307, reprinted in 1984 U.S.Code Cong. & Ad. News 3182, 3207 (emphasis added).  Nor is it clear why community ties, which did not at all stop this defendant from selling drugs, as described above, now will keep him from doing so again.  As Magistrate Judge Robinson found, the defendant's family and community ties do not rebut the presumption of dangerousness, where "the nature and circumstances of the offense charged indicate that the defendant allegedly was significantly involved in a conspiracy to distribute wholesale quantities of cocaine and cocaine base," and where "the weight against the Defendant is compelling."  M.J. Robinson, Memorandum of Findings of Fact and Statement of Reasons in Support of Order of Detention, November 17, 2005, at p.4.

WHEREFORE, the government respectfully requests that the Court deny the defendants' Motions for Modification of Conditions of Release.

Respectfully submitted,

Kenneth L. Wainstein
United States Attorney
D.C. Bar No. 451058

_____
Rachel Carlson Lieber
Assistant United States Attorney
D.C. Bar No. 456-491
Organized Crime and Narcotics Trafficking
555 4th Street, N.W., Room 4820
Washington, D.C.  20530
(202) 353-8055; Fax: 514-8707

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that I served a copy of the foregoing by ECF upon counsel for the defendant, this 23rd day of December, 2005.

_____
Rachel Carlson Lieber

**ATTACHMENT**

**WRITTEN PROFFER IN SUPPORT OF DETENTION, 05-386 (ESH)**

This written proffer regarding detention is provided for the convenience of the Court and counsel. The government intends to supplement it orally at the scheduled detention hearings. The proffer is based on the investigation to date, including agent review of: (a) oral and written law enforcement reports regarding this and other related investigations; (b) physical surveillance; (c) review of dialed number recorder data (pen register records) and telephone toll records; (d) review of vehicle registration records and licenses; (e) review of criminal history records; (f) review of wire interceptions pertaining to a target phone telephone (a cell phone listed in the name of Jones' wife but used exclusively by Jones) authorized by United States District Court Judge Paul L. Friedman on September 2, 2005, and extended on September 30, 2005, (g) debriefings of confidential informants (h) searches conducted on October 24, 2005. Evaluation and analysis of this information, particularly of the evidence seized on the 24th, continues. The identification of the drugs seized on October 24 is based on field tests and the opinion of agents expert in the area of drug trafficking, final lab tests have not yet been completed.

**CRIMINAL HISTORIES**

The government is aware of the following criminal history information concerning the charged defendants:

**ANTOINE JONES**, a/k/a **ANTONIO JONES, a/k/a/ "TOINE"** A search of FBI criminal history records for **JONES** (FBI# 901461KA2) revealed the following; 1989, District of Columbia, Carrying a Pistol Without a License and Disorderly Conduct, dismissed; 1991, Arlington, Virginia, Selling Cocaine, Guilty; 1993, District of Columbia, Possession of an

Unregistered Firearm and Possession with Intent to Distribute Cocaine, dismissed.

**ADRIAN JACKSON**  A search of criminal history record for **JACKSON** (FBI# 941681FB3) revealed that he has convictions for narcotics and weapons offenses, his most recent conviction being for Carrying a Handgun in Maryland in 2004.

**MICHAEL ANDRE HUGGINS**  A search of FBI criminal history records for **HUGGINS** (FBI# 200725JA2) revealed that he has convictions for narcotics and weapons offenses, his most recent conviction being for Providing Contraband (Heroin) to an Inmate, in 1995.

**KEVIN LAMONT HOLLAND**  A search of FBI criminal history records (FBI# 179452CB8) revealed that he has a1996 conviction in United States District Court in Virginia for Conspiracy to Distribute 50 Grams or More of Cocaine Base, for which he was sentenced to 120 months' incarceration in October, 1997.

**DEMETRIUS CORTEZ JOHNSON**.  A search of FBI criminal history records (FBI# 400182HA0) revealed that he has a 1987 conviction in Superior Court for the District of Columbia for UCSA Cocaine and an arrest in 02/1994 in Prince George's County, Maryland for Battery.

**JOHN ADAMS**  A search of FBI criminal history records for **ADAMS** (FBI# 952661CA4) revealed that he has convictions for narcotics, weapons, and  property offenses, including a 1993 conviction in the District of Columbia for Carrying a Pistol without a License.

## STRENGTH OF THE GOVERNMENT'S CASE

There has already been a finding of probable cause as to these defendants by the grand jury, however the court will obviously want some additional background in making a determination as to detention.  In brief summary the investigation to date has revealed the following relevant facts.

### A.  Prior to First Interception

In 2004, the FBI obtained information that a large narcotics distribution organization was operating in the greater Metropolitan Washington, D.C., area and elsewhere.    Based on information obtained from confidential sources and corroborated by physical surveillance, analysis of telephone records and pen registers, and other investigative techniques, The FBI learned that **ANTOINE JONES** was a major supplier of large quantities of cocaine, including kilogram quantities, for the organization.

_____ 1.  **JONES** is the sole proprietor of a nightclub named "**LEVELS**," which is located at 1960 Montana Avenue, N.E., Washington, D.C.  Investigators believed that **ANTOINE JONES** used his business as a location where he could conduct his drug trafficking activities, as well as launder drug trafficking proceeds.

2.  During this stage of the investigation, confidential sources provided details regarding **ANTOINE JONES'** large-scale narcotics trafficking organization.  The information provided by these confidential sources was  corroborated by independent investigation, including but not limited to surveillance, search warrants, debriefings of additional confidential sources and witnesses, a review of available subscriber information and pen-register data, and a review of stored text-messages on the cellular telephones of **LAWRENCE MAYNARD** and **ANTOINE**

11

**JONES**, obtained via search warrant.                                        .

3.  Information from these sources was corroborated by a traffic stop of **MAYNARD** on April 5, 2005.  The Highway Interdiction Unit of the Durham, North Carolina Police Department conducted a  traffic stop of a 1997 Honda Odyssey mini-van bearing Maryland tags 273M195, operated by **MAYNARD** and also occupied by **DERRICK GORDON** in the vehicle front passenger seat.  Their investigation revealed that this car was registered to **ANTOINE JONES**, with a date of birth of February 25, 1960, and to one of his residences, 12221 Brandywine Road, Brandywine, Maryland.  In the course of further investigation, the interdiction unit canine alerted on the right rear passenger area of the mini-van.  A search of the mini-van revealed a hidden compartment in the van, which contained six white plastic Target shopping bags, containing a total of $67,115.00 in U.S. currency, in various denominations, held together by rubber bands. When interviewed by the Interdiction Unit,  **MAYNARD** and **GORDON** both denied any knowledge of the secret compartment and the money contained therein.  The Honda Odyssey was impounded, the $67,115.00, was seized as evidence,  **MAYNARD** and **GORDON** received a warning ticket, and then were released without additional charges.

### B.  <u>First Interception Period -- September 3 - September 30, 2005</u>

4.  The following is a summary of the Court-authorized interceptions of **JONES'** conversations on the target telephone with other targets of this investigation, including some examples of specific calls.

5.  As an initial matter, the content and timing of many of **JONES'** calls demonstrates a clear pattern of suspicious contacts with several individuals, involving the timing and location of meetings, but without any other substantive content.  For example, on Day 2 of the interception

period, September 3, 2005, beginning at approximately 9:00 a.m., **JONES** made a series of telephone calls to several individuals, all within a few minutes of each other, and left a message for each, asking that person to call him back.  Over the course of the ensuing few hours, **JONES** spoke in person to each of these individuals, inquiring about where that person was, and indicating that he would be leaving his house shortly and would stop by.  Based on the similarity of the telephone contacts between **JONES** and numerous individuals, and their content, all referring to locations and times to get together, investigators believe that, throughout the course of the interception period, on nearly a daily basis, **JONES** met with various individuals, both at his nightclub, **LEVELS**, and other large public facilities (e.g., Sam's Carwash), and exchanged narcotics for money.

6.  For example, on that date at 9:14 a.m., **JONES** called **MICHAEL HUGGINS** at (301) 702-1124, believed to be the home telephone number for **HUGGINS**, and spoke to an unidentified male, who told him that "Mike" wasn't there.  At 9:15 a.m., **JONES** called (240) 475-2981, the cellular telephone listed in the name of **MICHAEL HUGGINS**, and left a message asking "Mike" to call him.  Then, at 1:51 p.m., **JONES** called **HUGGINS** again at (240) 475-2981, and stated that he was "outside."  **HUGGINS** stated that he would be down in a couple of minutes.  Investigators believe that within a few minutes of this call, **JONES** and **HUGGINS** engaged in a narcotics transaction.

7.  **JONES** repeated this pattern throughout the course of the interception period.  For example, on Day 5, September 6, 2005, at 10:45 a.m., **JONES** received a call from (202) 355-2621, a phone known to be in use by **DONALD HUNTER**.  **HUNTER** told **JONES** to call him when **JONES** got into town.  **JONES** asked **HUNTER** whether he would be ready, to which

HUNTER responded: "yeah." Then, at 11:10 a.m., HUNTER again called JONES, at which time JONES told HUNTER that he would call HUNTER back in three minutes. At 11:30 a.m., JONES called HUNTER and asked: "where you at, slim?" HUNTER responded that he was at 8th and H. JONES told HUNTER to come up to "where your girl work at,"and added a reference to what sounded like "the Circuit," to which HUNTER responded: "OK, I'm on my way."[1] JONES called HUNTER again at 12:21 p.m., and stated: "I want to wash my car, go wash my car." HUNTER asks whether he should go to the car wash, and JONES replied: "yeah." Investigators believe that this was a thinly veiled attempt by JONES to communicate to HUNTER that they should meet at Sam's Carwash to conduct a narcotics transaction. Sam's Carwash is within the same block as the Circuit City on Branch Avenue, an area to which JONES referred numerous customers over the course of the interception period, in order to engage in cocaine transactions.

8. JONES uniformly speaks in code throughout the interception period, with only the very occasional slip-up. For example, he and his drug-trafficking colleagues speak frequently of the need for "tickets," which investigators believe to be a reference to wholesale quantities of cocaine, perhaps kilograms. They speak, too, of "VIP tickets" (larger quantities) and occasionally of "little tickets." For example, on September 7, 2005, Day 6 of the interception period, throughout the course of the day, JONES had discussions with several people, including MAYNARD, about the sale of "tickets." At 10:24 a.m., JONES called (240) 463-3129, a telephone registered in the name of Simona Adama, but which is believed to be in use by JOHN

---

[1]    Agents believe that HUNTER has a romantic relationship with a woman who works at Circuit City on Branch Avenue in Temple Hills, Maryland.

ADAMS, and asked whether he was "in the house." **ADAMS** told **JONES** that he would be

there in 15 minutes. **JONES** told **ADAMS** to catch up with **MAYNARD** for that "ticket" and

that **MAYNARD** "knows what to do with it." **JONES** also told **ADAMS** to call him once he got

in the house, to which **ADAMS** replied: "10/4."

9. **JONES** then called **MAYNARD** at 10:25 a.m., and informed **MAYNARD** that

"John" would be calling him in 15 minutes, and that he has the ticket for "Pauline." Agents note

that throughout the course of the previous several days, there were telephone calls between

**JONES** and **PAULINE SPENCE** that were suspicious in nature, regarding "tickets" and

"flyers." **SPENCE** has no known relationship to **JONES** or his club, **LEVELS**.

10. One minute later, at 10:26 a.m., **JONES** called **SPENCE** and told her that

**MAYNARD** was going to call her, and that he will have another ticket and will "take care of

that," and that when he gets back from his trip to Baltimore, he would have another "VIP ticket."

11. At 2:22 p.m., **JONES** received a call from an unknown female, who asked whether

he remembered what she told him. **JONES** said "yeah, you need two more tickets." The

conversation then turned to VIP tickets, and the fact that she has two tickets and does not need

VIP tickets. **JONES** did not seem to understand what the female caller is saying, prompting her

to say "do you understand me?" They then discussed the fact that she will need "front row"

tickets soon, and **JONES** told her to call him and he will "take care of that" for her. Agents

believe that this conversation deals with varying quantities of cocaine, and that "front row"

tickets refers to the caller's desire for **JONES** to "front" cocaine to her, i.e., provide it to her on

consignment.

15

12.  In addition, there were coded telephone calls on that date which appeared to refer to guns and money.  For example, at approximately 10:06 a.m., **JONES** got a call from an unknown male at (202) 465-1651.  After some conversation about the possible sale of a soda machine, the unknown male paused and then said, haltingly, that while **JONES** "probably doesn't need one," he would "holler at [**JONES**] later about that, um, that heater."  When **JONES** asked what the male was talking about, the unknown male doesn't respond, at which point **JONES** asks: "what kind of heater?"  And the unknown male says: "you know, the desert."  They agree to talk more about this later.  Investigators believe that **JONES** and the unknown male are discussing the possible purchase of a Desert Eagle gun, in part because guns are frequently referred to as "heat" on the street.

13.  Further, at 10:33 a.m., **JONES** received a call from **GREGORY HAWKINS**, whom **JONES** refers to as his "partner" at various times during the interception period and whom investigators believe to be the money-man in the operation, at (202) 286-3057.  **JONES** told **HAWKINS** that he was in his house, but was about to go to Baltimore to look at houses. **JONES** asked **HAWKINS** whether he had "done that math homework."  **HAWKINS**, who sounded exasperated, stated: "there's no way in the world . . . I don't want to argue over it, there's nothing I can do about it, but I'm telling you, it's ridiculous . . . ."  **JONES** told him that he wished he could take **HAWKINS** "there to see," and then asked "what was it, $3? $2?" **HAWKINS** replied that it was "way way more than that."  **JONES** then slipped and asked whether it was "more than 3,000, I mean $3."  **HAWKINS** told **JONES** that it is more than 5, "that's why I'm saying something's gotta be wrong."  They agree to discuss the matter further after **JONES** returns from his house-hunting trip to Baltimore.  Investigators believe that this

conversation refers to a shortage of cash with respect to a narcotics deal.  As noted, at one point, **JONES** slips and refers to "3,000" but then recovers, saying "I mean, $3."  In addition, a money counting machine can be heard in the background.

14.  **JONES**, having returned from Baltimore, called **HAWKINS** again at (202) 286-3057, at 2:14 p.m.  **JONES** asked **HAWKINS** whether he was in the house, and when he responded that he was, **JONES** stated that he was coming over because he needed to talk to him.  A few minutes later, **JONES** received an incoming call from **ADRIAN JACKSON,** whom he had also referred to as his "partner" in other intercepted conversations, and told **JACKSON** that he was going over to his man's house around the corner.  Investigators believe that **JONES** was going to meet with **HAWKINS** to discuss the financial problem discussed in the call earlier that day, and that **JONES** was informing **JACKSON** of his efforts to clear up the problem.

15.  Throughout the remainder of the interception period, **JONES** and his colleagues continue to make reference to "tickets," in various forms, in a manner which investigators believe connotes wholesale quantities of cocaine.  For example, on Day 11 of the interception period, September 12, 2005, **JONES** urgently requested "two tickets" from **ADAMS**, who is believed to be the owner of at least one of **JONES'** stash houses, located just off of Branch Avenue, in Landover, Maryland – a location where **JONES** conducts much of his cocaine distribution – promising to get two tickets back to **ADAMS** the following day.

16.  Further, on Day 19 of the interception period, September 20, 2005, **JONES** had a conversation with **ADAMS** beginning at 1:08 p.m., in which  **ADAMS** told **JONES** that he would "have the ticket money" around 6:00 p.m.  **JONES** then told **ADAMS** that he still needed to "come through for Youngin" (an apparent reference to **DEMETRIUS JOHNSON**), to which **ADAMS**

17

responded that **JONES** might as well wait until later, when he has the "ticket money." Within 30 seconds of hanging up with **ADAMS**, **JONES** received an incoming call from **JOHNSON**, who discussed money with **JONES**, specifically that he is "26 in the hole." After further discussion of numbers, **JONES** told **JOHNSON** that he has "it" and "won't do nothin' with it" until he hears from **JOHNSON**, after **JOHNSON** speaks with someone else and "gets it straight." **JONES** also told **JOHNSON** during the course of the conversation that he has to get his car fixed first, but assured **JOHNSON** "I got you." **JOHNSON** answered an incoming call from call waiting, and after approximately 40 seconds, returned to **JONES** who asked: "you're talkin' VIP, right?" After **JOHNSON** assented, **JONES** told him to "call him back and tell him a couple of hours, right?"

17. Based on these calls between **JOHNSON** and **JONES**, investigators believe that **JOHNSON** was brokering a cocaine deal between **JONES** and another individual, to whom they refer as "little dude." This pattern of telephone communications mirrors a pattern of conversations between **JONES** and **JOHNSON** on September 3, 2005, Day 2 of the interception period. On that date, **JOHNSON** called **JONES** at 9:47 a.m. **JONES** asked **JOHNSON** whether he wanted the "same old same old, or something different?" **JOHNSON** replied that he would "call the dude back right now and see where's he's at and go from there." Two minutes later, **JOHNSON** called **JONES** again and stated that "he didn't answer his phone, but nine out of 10 times he's waiting for me." **JONES** told **JOHNSON** to call him, that he is "out and about." **JOHNSON** then called **JONES** at 5:10 p.m., and told **JONES** that he is going to "shoot up there" to the Club, and called again at 5:51 p.m., telling **JONES** that he is 10 minutes away. Finally, at 6:02 p.m., **JOHNSON** called **JONES** and told **JONES** that he was downstairs. Investigators believe that within a few minutes of this call, **JONES** and **JOHNSON** conducted a narcotics transaction, which **JOHNSON**

18

was likely brokering for another individual.

18.  Intercepted calls with similar content also confirmed investigators' suspicions, that **JONES** was supplying cocaine to **KIRK CARTER,** who has at least one conviction for narcotics trafficking.  For example, on September 9, 2005, Day 8 of the interception period, at 8:21 a.m., **JONES** called **CARTER** and asked if they got the last tickets from him.  **CARTER** replied "no, um, but you want me . .  You, um, going over there at halftime?"  **JONES** replied: "Nah, slim, I can do halftime with you, you ready for halftime?"  **CARTER** said: "I'll be over there and um make that delivery time . . .  I'll bring you your order over there."  **JONES** said that he would be over to where **CARTER** is in approximately 20 minutes.  **CARTER** agreed to wait for **JONES**.  Investigators believe that **CARTER** was making a delivery of money to **JONES**, which **CARTER** owed for fronted narcotics.  Similarly, the next day, **JONES** called **CARTER** at 5:51 p.m., and gave **CARTER** his new telephone number.  **CARTER** told **JONES** that he wanted to see him.  **JONES** was on Branch Avenue, and agreed to meet **CARTER** at the carwash.  **CARTER** called **JONES** again at 6:22 p.m., and informed him that he was at the carwash.  **JONES** stated that he was about five minutes away.  At 6:27 p.m., **JONES** called **CARTER** and asked "where you at?"  **CARTER** stated that he was at the McDonald's.  Investigators believe that shortly after this call, **JONES** and **CARTER** met at Sam's Carwash on Branch Avenue and conducted a narcotics transaction.  Finally, after a similar pattern of telephone contacts on September 15, 2005, between **JONES** and **CARTER**, the pair agreed to meet again at the carwash on Branch Avenue.  A surveillance team responded to that location in advance of **JONES** and **CARTER**, and took photographs of their brief meeting at the carwash, and again a few moments later in the Circuit City parking lot, a few blocks down

Branch Avenue.[2]

19.  Law enforcement surveillance further confirmed that **KEVIN LAMONT HOLLAND**, who uses cellular telephone number (202) 277-8552, and who himself has a conviction for Distribution of 50 Grams or More of Cocaine Base, is a significant customer of **JONES'**.  On very nearly a daily basis throughout the course of the interception period, **HOLLAND** and **JONES** would make arrangements to meet in various locations, usually along Branch Avenue, and, investigators believe, exchange money and cocaine.  For example, within hours of the initiation of wire interceptions on September 2, 2005, the following pattern of telephone contacts between **JONES** and **HOLLAND** occurred: at 5:14 p.m., **JONES** called (202) 277-8552,  and said "hello" several times, and then hung up.  At 5:15 p.m., **JONES** called **HOLLAND** again and got his voice mail, hanging up without leaving a message.  Also at 5:15 p.m., **JONES** received an incoming call from **HOLLAND**, but **JONES** did not answer and no message is left.  At 5:17 p.m., **JONES** received another call from **HOLLAND**, which similarly goes unanswered. Finally, at 5:19 p.m., **HOLLAND** got through on **JONES'** phone.  **JONES** asked **HOLLAND** to meet him at the Club, to which **HOLLAND** replied "Yep."   Following up on this previous telephone activity, **JONES** called **HOLLAND** at 5:51 p.m., and told **HOLLAND** that he was leaving the Club in a few minutes, and then inquired as to **HOLLAND's** whereabouts.  **JONES** told **HOLLAND** that he will head out Branch Avenue, and will meet him near the carwash, and **HOLLAND** agreed.  One minute later, **HOLLAND** called **JONES** and told him that he would be at Circuit City, because he needed some

---

[2]        Given the angle from which they were able to take photographs, it was impossible to capture what **JONES** and **CARTER** were doing with their hands.  However, investigators believe that at the Circuit City meeting, they observed **CARTER** toss a plastic bag into **JONES's** champagne-colored Jeep Grand Cherokee.

movies. Then, at 6:31 p.m., **JONES** received a call from **HOLLAND**, who stated that he was going to grab some "flyers" at an unintelligible location. **JONES** responded that he would pull around. Investigators believe that **JONES** and **HOLLAND** met within a few minutes of this call to conduct a narcotics transaction.

20.   After monitoring these conversations for approximately two weeks, investigators were able to capture in still photographs **JONES** and **HOLLAND** in the course of what investigators believe to be a cocaine transaction. Specifically, after a similar pattern of telephone calls, in which **JONES** and **HOLLAND** agree to meet at Oxon Hill Plaza, in Oxon Hill, Maryland, a team of investigators responded to that area and set up covert surveillance. Within a few minutes of their arrival, **JONES** appeared, driving his champagne-colored Jeep, and **HOLLAND** appeared, driving a silver Mercedes sedan, which is registered in his name. In the course of this brief meeting, investigators observed and photographed **HOLLAND** tossing a white plastic shopping bag into **JONES'** Jeep and then quickly departing. Within a few hours of this delivery, **JONES** and **HOLLAND** again agreed to meet. Investigators believe that within a few minutes of that conversation, **JONES** delivered cocaine to **HOLLAND**.

21.   Further, in the course of the investigation leading up to the initial affidavit in support of the wire tap, pen register data revealed that towards the end of every month, **JONES** spoke with an individual on a cellular telephone number with a (713) area code , which was subscribed to in the name of Juan Lopez {the user of this phone will be referred to as UM-1} in McAllen, Texas, a major point of entry of narcotics into the United States. On September 20, 2005, **JONES** received two

telephone calls from (713) 386-9548,[3] at 10:45 a.m., and again at 10:47 a.m. (the first call was apparently cut dropped mid-conversation), totaling 3 minutes and 46 seconds.  This is the first time that **JONES** has spoken with UM-1 during the course of the interception period.  During the call, UM-1 told **JONES** that he had been trying to find "some new music", but that it is getting a little rough on his side.  He assures **JONES**, however, that he has some "good people" who make some "good music," and that he is just waiting for them.  UM-1 then asks **JONES** whether he likes the music that UM-1 sent, to which **JONES** replies that "they love the sound, they love the entertainers, they love it."  **JONES** asks UM-1 whether they will take "a couple weeks," to which UM-1 responds that he still has a little bit of music there.  **JONES** mentions that "they like the whole studio, they like how they can practice back-to-back," and that everyone is happy on this side "as far as the band." UM-1 states that it will take "a couple weeks, right," and **JONES** states "they just go ahead and be ready."  UM-1 replies that he just needs time to "put the music straight and everything together and that will work."  Later in the conversation, UM-1 tells **JONES** that he was just trying to see if everything was cool and to inform **JONES** that everything looks good on his end, to which **JONES** responds that they just need it in a week or two, so it's cool.  Also, twice in the conversation, **JONES** tells UM-1 that he is going to the "Studio" later that day.  Investigators believe that in this conversation, **JONES** and UM-1 are discussing the quality of the most recent multiple-kilogram shipment of cocaine ("how do they like the music?" and "they love the music") and also discussing the timing of a forthcoming shipment ("everything looks good on this end" and "a week

---

[3]        While this is a different number than showed up on the pen register on **JONES'** phone in previous months, UM-1 actually tells **JONES** in the course of this conversation that this is his new number, to which **JONES** replies that he will "lock it in."  Further, both (713) telephone numbers come back to "Juan Lopez."

or two is cool").

22.  Then, on Monday, September 26, 2005, at approximately 6:30 p.m., **JONES** called UM-1 at (713) 386-9548, and reported to UM-1 that he has been working around the clock to get things together so that the "studio" be ready.  UM-1 replies "great" and says that a "friend" is going to get everything together by Wednesday (believed to be September 28, 2005), and that they are going to pick up the "discs" of which they have nine remaining, and requests that **JONES** "give [him] a hand."  At that point, **JONES** cuts him off, saying "we got you, we got you – we can't do it no quicker but we're trying," stating that they have "been going 24 hours a day" with "100 things going," but that they should be ready by Wednesday.  Both men express a hope that, after Wednesday, everything will be in place so that they can "take a few days off."  Investigators believe that in this conversation, **JONES** and UM-1, who supplies cocaine to him, are discussing the timing of the next big shipment of cocaine, and **JONES'** ability to collect money in advance from his customers to pay for this shipment.  In the hour after this call, **JONES** attempted to contact or contacted **ADAMS, HOLLAND, JOHNSON,** and **CARTER**.

23.  Further, with respect to **JONES'** supply chain, **JONES** made suspicious telephone calls with great frequency during the middle of the interception period, with telephone number (678) 330-7712, a Nextel cellular telephone, subscribed to in the name of John Yi, at an Atlanta, Georgia address.[4]  In these calls, all of which are initiated by **JONES**, **JONES** states simply "what's up" or "yeah" or "OK," to which UM-2 responds in kind.  In a few of these calls, **JONES** says "20 minutes," or "5 minutes," or similar. Investigators believe that through these calls, **JONES** is

---

[4]      Investigators similarly believe that this is a fictitious name, and for ease of reference, will refer to the user of this telephone as "UM-2.".

signaling to UM-2 a time to meet at a pre-ordained location, believed to be the stash location at 9508 Potomac Drive, Ft. Washington, Maryland.  Investigators further believe that UM-2 may be the "friend" who is going to "hook everything up," to whom UM-1 referred in the September 26, 2005, telephone call with **JONES.**

24.  Finally, toll records pertaining to (678) 330-7712, have revealed that UM-2 utilizes the "direct connect" function on his telephone – which allows him to speak with another Nextel subscriber, if he specially identifies that number with Nextel, with the touch of one button.  Of the few telephone numbers he has specifically identified, two of them are these (713) numbers subscribed to by Juan Lopez, UM-1.  Thus, investigators believe that UM-1 and UM-2 are close associates of each other, and are likely members of the supply-chain leading to **JONES**.

### C.  Extension Period -- September 30 - October 24

25.  During the period after September 30, 2005, **JONES** continued his use of the code "tickets,"which investigators believe to be a reference to wholesale quantities of cocaine, perhaps kilograms.  Throughout the course of the extension period, **JONES**'s drug-trafficking colleagues speak frequently of their need for various numbers of "tickets,"  They continue to speak, too, of "VIP tickets" (larger quantities) and occasionally of "little tickets."  For example, on October 3, 2005, **JONES** and **JOHN ADAMS** discuss someone who needs four tickets. **ADAMS** says he has three tickets and needs one more. **JONES** says he thought **ADAMS** had four tickets. However, **JONES** then recalls that "peanut" got one of those tickets. **JONES** says he will be at **ADAMS's** house in about two minutes.   The following day, at 9:54 a.m., **JONES** called **ADAMS**, and asked whether that dude came and got "those three tickets."  **ADAMS** replied that he hadn't but that he was coming that day. **JONES** told **ADAMS** to call him as soon as that dude comes, because **JONES** had to pay

24

the lease on the club, which had been in arrears, that day. Later that day, at 4:58 p.m., **JONES** called **ADAMS**, who informed **JONES** that he was "waiting on him right now." **JONES** planned to come see **ADAMS** later. Then, at 5:58 p.m., **ADAMS** called **JONES** and told him that he sold those tickets and that he would be home in the next 20 minutes. **JONES** said that he would catch **ADAMS** in the morning. Investigators believe that in this series of conversations, **JONES** and **ADAMS** are discussing the sale by **ADAMS** of four kilograms of cocaine, and the arrangement for subsequent payment to **JONES** therefor.

26. Wire interceptions further reveal the role of Texas suppliers in **JONES'** organization. For example, on Monday, October 10, 2005, **JONES** spoke with an unknown Hispanic sounding male (UM-1) on (713) 386-9548, who indicated that it should be another 7-8 days before things are ready. Throughout the course of this period, **JONES** also had more frequent contact with another Hispanic sounding male (UM-3)at (909) 975-0957, which is a Nextel cellular telephone registered in the name of Mike Wills in Irvine, California, and believed to be a fictitious name, in which the pair seem to meet on numerous occasions at a location which investigators believe to be the stash house in Ft. Washington, Maryland. For example, on October 4, 2005, at 10:56 a.m., **JONES** called (909) 975-0957, and asked UM-3 what time he could get to "the spot." The unknown male replied "15 or 20 minutes?" **JONES** said "OK" and hung up the phone. Then, at 11:19 a.m., UM-3 called **JONES** from (909) 975-0957, and stated that he was "already there." **JONES** replied that he would be there in 10 minutes. Based on the first call, a team of investigators quickly set up surveillance on a road near the suspected stash house in Ft. Washington, Maryland. Sure enough, a short time after the second call, **JONES** drove into the neighborhood in his Jeep Cherokee, and was observed and photographed driving out of the neighborhood a few moments later, in the company of a Hispanic

male. When searches and arrests in this case occurred on October 24, 2005, defendant **ROEL BREMEA, JR.** was identified as the same person, identified up to that point as UM-3.

27. Similarly, on October 13, 2005, at 5:25 p.m., **JONES** called the (909) number.  UM-3 who answered said that he would only be around until 8:00 p.m., and then he was going to meet the girls.  **JONES** said he would swing by, either before then or the following morning.  **JONES** also referenced "20 of the VIP tickets."  **JONES** followed up on this call at 7:13 p.m, when he called the (909) number again and stated that he was 5-10 minutes away.  Approximately 30 minutes later, in rapid succession over the course of 8 minutes, **JONES** called **KEVIN HOLLAND**, **DEMETRIUS JOHNSON**, **MIKE HUGGINS**, and **JOHN ADAMS**, each call lasting between 41 seconds and 1 minute and 35 seconds.  For unknown reasons, the wire tap equipment transmitted no audio with respect to these calls (or several non-pertinent calls thereafter).  Investigators nonetheless note the significance of this flurry of calls by **JONES** to his usual purchasers, in the immediate aftermath of his meeting with the user of (909) 975-9057, a likely cocaine supplier, as **JONES** notifying his customers that another shipment was coming through.

28. It further became apparent from the interceptions that there were times within the month that **JONES** became low on cocaine, and was awaiting a large shipment from these Texas suppliers. For example, on Friday, September 30, 2005, **JONES** and **JOHN ADAMS** discussed whether **ADAMS** could sell someone five VIP tickets.  **JONES** told **ADAMS** that at the moment it couldn't be done because there would not be enough for everyone else.  Investigators believe that **JONES** is referring to the fact that his drug supply is low and if they make a larger sale now they will not be able to supply anything to their other customers.

26

29.  This belief is confirmed by a call on Monday, October 3, 2005, between **JONES** and **DEMETRIUS JOHNSON**, in which **JONES** tells **JOHNSON** that he was trying to save a couple of tickets for **JOHNSON**, and that **JOHNSON** should holler at him when he was ready.  And further confirmed by a call that **JONES** received at 4:25 p.m., on Tuesday, October 4, 2005, from **BREMEA** at (909) 975-0957, who stated that "um, Saturday, we are going to have that party after all," to which **JONES** replied "OK."  And finally by a conversation on Wednesday, October 5, 2005, which confirmed investigators' suspicions that **JONES** was hoping to receive a shipment of cocaine from his suppliers over the coming weekend.  At 11:44 a.m. that day, **PAULINE SPENCE** called **JONES** and asked whether something was going to happen soon.  **JONES** told **SPENCE** that he didn't want to talk about it over the telephone, but that it would be soon.

30.  It is further apparent from wire interceptions that **JONES** anticipated another shipment of cocaine on October 13, 2005.  For example, on October 12, 2005, at 12:36 p.m., **JONES** received a call from **BREMEA** at (909) 975-0957, who stated: "hey, the girls are coming tomorrow night." To which **JONES** responded in an animated voice: "gotcha, gotcha, gotcha."  Then,  in his next call, at 12:44 p.m., **JONES** called **JOHN ADAMS**, and told **ADAMS** to tell his brother-in-law "sometime tomorrow."  Clearly confused, **ADAMS** said "huh?"  **JONES** said "brother-in-law.  Youngin didn't tell you about brother-in-law?"   **JONES** repeated "tomorrow" several times throughout the conversation.  Finally **ADAMS** seemed to understand, saying "Tomorrow?  Oh, okay, you must mean my cousin."  **JONES** told **ADAMS** that he needed to "see you all" today so that he could be ready with his video tomorrow.  (Investigators believe that in this conversation, **JONES** is telling **ADAMS** that he needs to collect money from his customers to be ready for the cocaine shipment the following day).  Then, at 12:47 p.m., **JONES** received a call from an unknown subscriber using cellular

telephone number (202) 286-3057, who told **JONES** that he just wanted **JONES** to know that he was back. **JONES** and the caller discuss their whereabouts, and then at the end of the brief conversation, **JONES** said to the caller: "I was talking to your uncle, they they, he said he's gonna come talk to you tomorrow." Next, at 1:40 p.m., **JONES** received a call from **MIKE HUGGINS**. **JONES** told **HUGGINS** that he spoke with "Playboy" and then stated "tomorrow sometime, man." **HUGGINS** replied that he was waiting on **JONES**. Later, at 3:05 p.m., **JONES** called **ADRIAN JACKSON** and said: "Um, tomorrow." After there was a pause, **JONES** asked: "you know what talking about? Your uncle." **JACKSON** replied: "alright." **JONES** stated: "tomorrow." Further, at 7:40 p.m., **JONES** called (202) 286-3057, which is registered in the name of Kim's Wireless, at 1801 Pennsylvania Avenue, and believed to be in use by **JONES's** "partner" **GREGORY HAWKINS**, and told the unknown male that "Youngin said he will probably see us tomorrow evening." The male replied "alright," and the pair hung up. Finally, at 9:18 p.m., **JONES** received an incoming call from an unknown male using telephone number (202) 276-5208. This male wanted to borrow $7,000 from **JONES** to pay two of the bands who perform and at **LEVELS**. **JONES** told the male that he didn't have that kind of money on him now, but noted that the man's uncle was supposed to be in town the following day. In sum, investigators believe that this pattern of thinly-veiled calls relates to the initial call from **BREMEA** at (909) 975-0957, indicating that something would be coming into town the following day, presumably a large quantity of cocaine. Throughout the day, **JONES** communicated with several of his customers, referring to this call with their "uncle" or other relative - **BREMEA** - and indicating that he would be in town the following day.

31.  While it is not precisely clear when that shipment arrived, as of Saturday, October 15, 2005, **JONES** was flush with cocaine again.  At 10:10 a.m. that day, **JONES** called **JOHNSON** and asked whether **JOHNSON** wanted him to come through and catch him.  **JOHNSON** replied that he was still waiting on two dudes, and would call **JONES** as soon has he had caught up with them.  Shortly thereafter, **JONES** called **HUGGINS** and told him he was about to "make a run" and asked what was up with **HUGGINS**.  The pair agreed to meet at the Lowe's home improvement store in Clinton, Maryland.  A subsequent call, at 11:45 a.m., revealed that **JONES** and **HUGGINS** met up at the Lowe's.  Over the course of the next several hours, **JONES** called **GREGORY HAWKINS, KIRK CARTER, FNU, LNU, a/k/a JAUON JENKINS, JOHN ADAMS, DEMETRIUS JOHNSON, and ADRIAN JACKSON** arranging similar meetings.  Investigators believe that **JONES** delivered cocaine to each of these individuals throughout the day.

32.  Further confirmation of **JONES's** drug trafficking activity comes from an arrest on October 14, 2005, of **DONALD HUNTER**, shortly after he arranged to meet with **JONES** at **LEVELS**.  That morning, **HUNTER** called **JONES** and said that he was going to stop by the club.  Investigators set up surveillance, and observed his Jeep parked outside the club in the late morning.  Once **HUNTER** emerged from **LEVELS**, investigators followed him for some distance, and then conducted a traffic stop of his car, based on an arrest warrant which was outstanding on **HUNTER** in an unrelated matter.  Recovered from **HUNTER** was approximately 50 grams of cocaine powder and a handgun.

33.  Finally, wire interceptions over the last few days of the interception period made clear that **JONES** and his associates were continuing their pattern of drug trafficking activity, as set forth above.  For example, on October 17, 2005, at 4:51 p.m., **JONES** called **CARTER** and asked whether

he wanted some tickets.  **CARTER** replied that he would come see **JONES** the following day.
**JONES** mentioned that the tickets were $10.50, and **CARTER** said that he didn't know that.  They
agree to discuss the price difference in person, not over the phone.  Further, **JONES** received a
telephone call from **BREMEA,** from (909) 975-9057, who said that he just wanted to let **JONES**
know that "I took off where I live, and I will be out for a day or two."  To which **JONES** replied:
"Ah, man."  **BREMEA** said that he would call **JONES** as soon as he got back.  True to his word,
mid-day on October 19, 2005, **BREMEA** called **JONES** again, and indicated that he would be back
in the area at approximately 5:00 p.m.  Also, late-morning this same day, **JONES** received a call from
UM-1, another Hispanic male whom investigators believe to be associated with **BREMEA** in
**JONES'** supply chain, indicating that something would be happening on Friday (October 21, 2005).
Investigators believe that these telephone calls from **JONES's** suppliers are tipping **JONES** off to
the timing of the arrival of a large shipment of cocaine.

34. On Friday October 21, 2005, and Saturday October 22, 2005, intercepted calls indicated
that **JONES** was planning to be out of the area but would return on Sunday, October 23, 2005. When
**JONES** returned on Sunday, he spoke to or attempted to speak to **HUGGINS**, **ADAMS, JOHNSON,
JACKSON,** and **CARTER.**  In one of the intercepted calls **JONES** indicated that he had to "make
the rounds."  The investigators interpreted these events as an indication that **JONES** had obtained a
supply of drugs and was in the process of distributing them to his usual customers.

**D. <u>Searches and Arrests on 10/24/05</u>**

Based on the conversations described above a decision was made to execute search warrants
that had already been approved by  Magistrate Judge Charles Day in Greenbelt, Maryland and this
Court for various locations. The searches yielded the following results.

35. **<u>JONES</u>**

**(1)  10870 Moore Street, Waldorf, Maryland**

**(2)  12221 Brandywine Road, Brandywine, Maryland**

**(3)  1960 Montana Avenue N.E. Washington, D.C. (Levels Nightclub)**

The first two address are the residences for Antoine and Deniece **JONES**.  The Brandywine Road address is used as the primary mailing address and the address where Deniece **JONES** has her cellular telephone, "the target phone," registered.  Four vehicles, a Jeep Cherokee (registered in the name of Deniece **JONES**), a Toyota Sequoia (registered in the name of Deniece and **ANTOINE JONES**), a Cadillac (registered in the name of **ANTOINE JONES**), and a box truck (also registered in the name of **ANTOINE JONES**), are all registered to this address.  Surveillance conducted throughout the course of this investigation has shown that the Jeep, Cadillac and Sequoia have all been observed parked at the Moore Street address.  Surveillance frequently showed **ANTOINE JONES** driving the Jeep.  Finally, Antoine **JONES** has a hard line registered to "A. **JONES**" at the Moore Street address**.**

When the  search warrant was executed at the Moore Street address.  **JONES** was present as were his wife and son.  Various records, cell phones, and pagers were located.  $69,000 in cash was found in the Jeep Cherokee registered to **JONES**' wife but driven almost exclusively by **JONES.**

In the search at Montana Avenue, Levels nightclub, a stolen 9mm handgun was found in the office area.

35. **ADRIAN JACKSON**

**7921 Allendale Drive,  Landover, Maryland**

This address is the where Adrian **JACKSON** is currently residing.  **JACKSON** has been overheard telling **JONES** that he is staying at his "Ma's."  Based on telephone calls between **JONES** and **JACKSON** in which they arrange to meet, and surveillance of **JONES** thereafter, Investigators know that **JONES** traveled to the above described address to meet with **JACKSON**.  Further, on October 16, 2005, at approximately 09:40 a.m., and October 18, 2005, at approximately 08:24 a.m., physical surveillance of this location revealed a silver Chrysler 300M bearing D.C. tag CA1898.  This vehicle is registered to **ADRIAN JACKSON** and is known to be the primary vehicle driven by **JACKSON**.  Finally, on October 20, 2005, **JACKSON** is intercepted on the wire telling **JONES** that he is about to "lay down."  Shortly thereafter, physical surveillance of this location revealed the Chrysler parked outside that location.

**JONES** considers **ADRIAN JACKSON** to be his "partner" not only at his night club, **LEVELS**, but also a partner in his narcotics trafficking.  **JONES** and his wife are currently helping **JACKSON** purchase a house.  To this end, they have given **JACKSON** money for a down payment.

The following is a sampling of conversations illustrating the above:  On Wednesday, October 12, 2005 at 3:05 p.m., after **JONES** received a call from **BREMEA** who told him that "the girls are coming tomorrow night," he telephoned **JACKSON**.  **JONES** told **JACKSON**, "Tomorrow."  There is a pause after which **JONES** asks **JACKSON** if he knows what **JONES** is talking about?  "Your uncle." **JACKSON** says "alright." **JONES** reiterates, "tomorrow." Given that **JONES** made several other phone calls within a short time of this call to other of his standard customers, alerting them to the arrival of their "uncle" or "cousin," investigators believe that this reference to "your uncle" refers

to **JONES's** Hispanic cocaine supplier. In addition, in this same telephone conversation, **JONES** and

**JACKSON** discuss plans for **JACKSON** to meet with **JONES's** wife, who has a real estate license,

to continue house-hunting.

When the search warrant was executed **JACKSON,** was found in the house. Also found

were a small bag of crack cocaine, electronic scales, which are associated with narcotics packaging,

a handgun, and $2700 in cash.

36. **MICHAEL HUGGINS**

**5119 Barto Avenue, Suitland, Maryland  20746**

This is the residence of Michael, a/k/a "**MIKE**," and Anja **HUGGINS**. The listed owner

of this residence is Anja **HUGGINS,** wife of **MICHAEL HUGGINS**. **MICHAEL HUGGINS**

is known to be a close associate of **JONES**. **JONES** frequently supplies **HUGGINS** with

multiple kilogram quantities of cocaine. On a number of occasions, **JONES** has telephoned the

hard line listed to this address in the name of Anja **HUGGINS**, and has spoken with both Anja

and **MICHAEL HUGGINS**. The following is a sampling of conversations highlighting

**HUGGINS'** narcotics trafficking activities: On the first day of the interception period, Friday,

September 2, 2005 at 7:27 p.m., **JONES** received an incoming call from (301) 702-1124, which is

listed to "Anja **HUGGINS**." **JONES** asked **MIKE HUGGINS** if he was at the house and

whether he was "ready." **HUGGINS** told **JONES** that he needed "a little somethin' somethin'."

**JONES** told **HUGGINS** that he was waiting for **ADRIAN JACKSON**, and that he'll be around

in a couple of minutes and to meet him outside. At 7:36 p.m., **JONES** called **HUGGINS** (to

whom he refers as "Mike"), and told him that he [**JONES**] was outside. Agents believe that

**JONES** and **HUGGINS** met within a few minutes of this call to conduct a narcotics transaction.

33

There are a number of conversations similar to this during/after which Investigators believe narcotics transactions were consummated.

On Wednesday, October 5, 2005, after several attempts to reach **MICHAEL HUGGINS**, **JONES** finally got through at 11:07 a.m. and told **HUGGINS** that he had "that picture and stuff" for him and that he would walk up. Investigators believe that **JONES** met **HUGGINS** at the above mentioned address and conducted a narcotics transaction. A few minutes later, **HUGGINS** called **JONES**. **JONES** asked **HUGGINS** how many tickets he had left. **HUGGINS** said that he had two, but only has half now. **JONES** told **HUGGINS** to call him once he was finished working. **JONES** called **HUGGINS** back a minute later to confirm that **HUGGINS** had sold one and a half "tickets." Agents believe the use of the word "tickets" actually refers to a large quantity of cocaine presumably a kilogram.

When the search warrant was executed on this location **HUGGINS** was not present, but 1/8 of a kilogram of cocaine, a digital scale, and $ 10,700 in cash were seized.

37. **DEMETRIUS JOHNSON**

**10441 Crescent Park Way, Waldorf, Maryland**

This location is the residence of **DEMETRIUS JOHNSON**. On October 19, 2005, at approximately 07:49 a.m, physical surveillance of this location revealed a 2002 Chevy 4-door pick-up truck bearing Maryland tag: 364M100. This vehicle is registered to Demetrius Cortez Johnson at 10441 Crescent Park Way, Waldorf, Maryland. Further, on the first day of the interception period, September 2, 2005, surveillance revealed **JOHNSON** driving this truck to a meeting with **JONES**. Finally, an open source database indicates that 10441 Crescent Park Way is his current address, as of October 2004.

34

JOHNSON is a regular narcotics customer of JONES. JOHNSON is believed to regularly purchase kilogram quantities of cocaine from JONES. Notably, JONES, and several of his associates, often refer to JOHNSON as "youngin'." The following is a sampling of conversations between JOHNSON and JONES demonstrating their drug relationship: On Monday, September 5, 2005, at 1:21 p.m., JONES called JOHNSON, who stated that he was about to leave the parking lot. With a note of frustration in his voice, JONES told JOHNSON, "Hold up, slim. I need to see you." JOHNSON said that he would wait for JONES who was around the corner and would "be right there." Investigators believe that within a few minutes of this call, JONES and JOHNSON completed a narcotics transaction. Also, on Monday, September 12, 2005 at 10:37 p.m., JONES called JOHNSON and asked if JOHNSON still needed "those two little tickets." JOHNSON responded "Yes, if it's possible." JONES told JOHNSON that he could probably get JOHNSON those tickets tonight if he wants. JONES also told JOHNSON that he could probably use the "homework" that JOHNSON was looking over. He ended by telling JOHNSON that he has to "see if [his] man is up." Agents believe that, again, "tickets" is a reference to kilogram quantities of cocaine and "homework" refers to some sort of accounting/money for previous drug sales. Investigators believe that the reference to "his man" is JOHN ADAMS, whose house is located just off of Branch Avenue, and is believed to be one of JONES's stash houses. Later this same day, at 10:43 p.m., JONES called JOHNSON back and left a message asking JOHNSON to call him back. While the wire transmissions indicate only a series of attempted phone calls between JONES and JOHNSON after this message, Investigators believe that at some point later in the evening, JONES delivered the "two tickets," believed to be kilograms of cocaine, to JOHNSON. In support of this conclusion, the following day, JONES

called **JOHNSON** at 5:17 p.m., and asked whether **JOHNSON** still had "those two tickets" he gave him. **JOHNSON** replied that he did, but noted that he was "getting ready to get rid of them in a minute." **JOHNSON** noted that he would need "that VIP" but that he would instead get "this one to" **JONES**. It is thought that a "VIP" or "VIP ticket" refers to more than one kilogram, possibly two kilograms wrapped together.

When the search warrant was executed on this location **JOHNSON** was present. Also found was a black bag with numerous bags of cocaine with a total weight of ½ kilogram. Several small bags of cocaine were found in a dresser drawer. Also found was approximately $12,000 in cash.

38. **JOHN ADAMS**

**5703 Gloria Drive, Suitland, Maryland**

This is the residence of **JOHN** and SIMONA **ADAMS**. **JOHN ADAMS** and **JONES** often talk on a hard line telephone registered in the name of Simona **ADAMS** at the above address. **JOHN ADAMS** is a close associate of **ANTOINE JONES**. Investigtors believe that **JONES** uses the **ADAMS'** residence as a stash house for his narcotics. There are countless telephone calls between **JONES** and **ADAMS** during which the two discuss whether or not **ADAMS** is home which is generally followed by **JONES** stopping by this residence. Additionally, based on wire interceptions, in which **JONES** and **ADAMS** discuss the fact that **ADAMS** is "in the house" and then discuss whether "the dudes have stopped by to get their tickets" or similar language, it is believed that **JONES** often delegates narcotics distribution duties to **ADAMS**. Surveillance on a number of occasions also has revealed **JONES** going to and coming from **ADAMS'** house to conduct/facilitate narcotics transactions. The following is a sampling of conversations demonstrating **ADAMS'** role: On Wednesday, September 7, 2005 at 10:24 a.m., **JONES** called **ADAMS**, and asked whether he was

"in the house."  **ADAMS** told **JONES** that he would be there in 15 minutes.  **JONES** told **ADAMS**
to catch up with **MAYNARD** for that "ticket" and that **MAYNARD** "knows what to do with it."
**JONES** also told **ADAMS** to call him once he got in the house.  To which **ADAMS** replied: "10/4."
Again, it is believed that the reference to "ticket" refers to cocaine.

On Thursday, September 8, 2005 at 9:53 a.m., **JONES** called **ADRIAN JACKSON** and left
a message on **JACKSON's** voice mail, stating that he "left [**JACKSON's**] bag over at **JOHN's**."
**JONES** reiterates that he left **JACKSON's** bag at **JOHN's**.  On the same day at 10:54 a.m., **JONES**
spoke with "**JOHN**, " telling him to tell **JACKSON** that he left that bag at **JOHN's** house for him,
but that only one bag is his.  In another instance, **JONES** speaks with an unknown female, believed
to be **SIMONA ADAMS** and seems to be encouraging her to get back into the cocaine-trafficking
business.  On Monday, September 12, 2005 at 10:42 p.m., **JONES** called **JOHN ADAMS** stating
that he needed a favor.  **JONES** needs two tickets, and will give them back tomorrow.  **JONES** asks
**ADAMS** whether he is "at the house."  **ADAMS** replied that he was, and **JONES** told him he would
be there in a minute.  The next day at 4:50 p.m., **ADAMS** called **JONES** and told **JONES** that he
needed those two tickets that he gave to **JONES** last night back as soon as possible.  **JONES** stated
that he was at the club and that he would "make a call."  **ADAMS** said "OK."  One minute later,
**ADAMS** calls **JONES** again, and told **JONES** that he was trying to find another "four of them
tickets."  **ADAMS** asked **JONES** "what's up with youngin'" (a reference to **DEMETRIUS**
**JOHNSON**), and **JONES** replied that he thought that "youngin" had already sold a couple of his
tickets.  The pair continue to discuss how many tickets various people have and need.

On Sunday, September 18, 2005, **JONES** and **ADAMS** discuss "cutting the cake." This is believed to be a reference to re-packaging drugs. Finally, on October 15, 2005, **ADAMS** calls **JONES** and tells **JONES** that he is sitting there waiting. **JONES** asks if the party was cool with [unintelligible] . **ADAMS** says, yeah, the party must have been cool. He talked with him this morning and the flyers must be good. He liked the format and the way they were designed.... **ADAMS** tells **JONES** he has the day off and is waiting for some things to happen. **JONES** tells **ADAMS**, if Youngin' and them call, tell them he's at the movies.

When the search warrant was executed on **ADAMS'** home, **ADAMS** and his wife were both present. Also found was 155 grams of cocaine, a digital scale, two handguns, and $9600 in cash.

39. **ALBERTO ROLANDO CARRILLO-MONTELONGO**

   **ROEL BREMEA, JR.**

   **RICARDO SANCHEZ-GONZALEZ**

**9508 Potomac Drive, Fort Washington, Maryland**

This location is believed to be the stash/meeting location for **JONES's** Hispanic drug suppliers. On a number of occasions, surveillance revealed **JONES** at this location.

Further, with respect to **JONES'** supply chain, over the course of the interception period, **JONES** had numerous suspicious telephone conversations with telephone number (678) 330-7712, a Nextel cellular telephone, in use by UM-2. In these calls, all of which are initiated by **JONES**, **JONES** states simply "what's up" or "yeah" or "OK," to which UM-2 responds in kind. In a few of these calls, **JONES** says "20 minutes," or "5 minutes," or similar. After many of these occasions, surveillance revealed that within the appointed time-frame, **JONES** was at the 9508 Potomac Drive address.

Further, toll records pertaining to (678) 330-7712, have revealed that UM-2 utilizes the "direct connect" function on his telephone – which allows him to speak with another Nextel subscriber, if he specially identifies that number with Nextel, with the touch of one button. Of the few telephone numbers he has specifically identified, two of them are these (713) numbers subscribed to by Juan Lopez, UM-1. Thus, investigators believe that UM-1 and UM-2 are close associates of each other, and are likely members of the supply-chain leading to **JONES**.

Wire interceptions further reveal the role of Texas suppliers in **JONES'** organization. For example, on Monday, October 10, 2005, **JONES** spoke with UM-1 on (713) 386-9548, who indicated that it should be another 7-8 days before things are ready. In recent weeks, **JONES** also has had more frequent contact with another Hispanic sounding male, now identified as **ROEL BREMEA**, at (909) 975-0957, in which the pair arrange to meet on numerous occasions at the 9508 Potomac Drive house. For example, on October 4, 2005, at 10:56 a.m., **JONES** called (909) 975-0957, and asked **BREMEA** what time he could get to "the spot." **BREMEA** replied "15 or 20 minutes?" **JONES** said "OK" and hung up the phone. Then, at 11:19 a.m., **BREMEA** called **JONES** from (909) 975-0957, and stated that he was "already there." **JONES** replied that he would be there in 10 minutes. Based on the first call, a team of investigators quickly set up surveillance on a road near 9508 Potomac Drive. A short time after the second call, **JONES** drove into the neighborhood in his Jeep Cherokee, and was observed and photographed driving out of the neighborhood a few moments later, in the company of a Hispanic male, later identified as defendant **BREMEA**.

Similarly, on October 13, 2005, at 5:25 p.m., **JONES** called the (909) number. **BREMEA** who answered said that he would only be around until 8:00 p.m., and then he was going to meet the girls. **JONES** said he would swing by, either before then or the following morning. **JONES** also

referenced "20 of the VIP tickets." **JONES** followed up on this call at 7:13 p.m, when he called the (909) number again and stated that he was 5-10 minutes away. Surveillance revealed that within approximately 10 minutes, **JONES** went to the 9508 Potomac Drive house. Then, approximately 30 minutes later, in rapid succession over the course of 8 minutes, **JONES** called **KEVIN HOLLAND**, **DEMETRIUS JOHNSON**, **MIKE HUGGINS**, and **JOHN ADAMS**, each call lasting between 41 seconds and 1 minute and 35 seconds. For unknown reasons, the wire tap equipment transmitted no audio with respect to these calls (or several non-pertinent calls thereafter). Investigators nonetheless note the significance of this flurry of calls by **JONES** to his usual customers, in the immediate aftermath of his meeting with the user of (909) 975-9057, a likely cocaine supplier, as **JONES** notifying his customers that another shipment was coming through.

When the search warrants was executed on this location defendants **BREMEA**, **MONTELONGO**, and **GONZALEZ** were found in the house. **BREMEA** attempted to flee through an elevated rear window of the house. The house had very little furniture. Notable items therein were two or three air mattresses, a kitchen table and chairs, and a television set with an inexpensive video game unit.

More significantly, in the attic of the structure 97 kilograms of cocaine and 3 kilograms of cocaine base were located. Also found in the attic was $750,000 in cash in shrink wrapped bundles.

On the first level of the house in a closet in a back bedroom in excess of $94,000 in loose cash was located, along with a money counting machine. In the kitchen two heat sealing devices and shrink wrap were located.

40

## SUMMARY OF RELEVANT FACTS AND SPECIFIC DETENTION FACTORS

Given the quantities of cocaine and cocaine base involved in this conspiracy, seizures alone approaching 100 kilograms of cocaine and 3 kilograms of cocaine base, all the defendants face a minimum mandatory sentence of 10 years, higher for some, based on their criminal histories as set forth below.  21 U.S.C.§ 841(b)(1)(A). Under the Federal Sentencing Guidelines the base offense level is 38, § 2D1.1(c), for a guideline range of 188-235 months with no criminal history, which, of course, is not true for many of these defendants.

Given the facts presented and this kind of exposure, all of the defendants pose a danger to the community and a  risk of flight. 18 U.S.C. 3124(f)(1)  Since the offense charged carries a maximum sentence in excess of 10 years under the controlled substance laws the statutory presumption under 18 U.S.C. 3142(e) applies. And, as laid out in the Pretrial Services Reports, given their criminal histories several of the defendants are covered by other detention provisions as well.

(a)  **ANTOINE JONES -** Virtually every section of this proffer is applicable to **JONES**. In addition, given his criminal history, including a prior drug felony, **JONES** faces a minimum mandatory sentence of 20 years.

(b)  **JOHN ADAMS -** Particularly relevant to **ADAMS** are paragraphs 8, 9, 15, 16, 24, 25, 26, 27, 33, and 38.  **ADAMS** also has two felony convictions.

(c)  **DEMETRIS JOHNSON**- Particularly relevant to **JOHNSON** are the following paragraphs of this  proffer: 16,17, 22, 28, 30, 33, and 37.

(d)  **ADRIAN JACKSON** - Particularly relevant to **JACKSON** are the following paragraphs of this proffer: 14, 29, 30, 33 and 35.

41

    **(e)  ALBERTO ROLANDO CARRILLO-MONTELONGO**- Particularly relevant is paragraph 39 of this proffer.  Additionally, given the lack of any known ties this defendant has to the United States the risk of flight here is particularly high.

    **(f)  ROEL BREMEA, JR.** - Particularly relevant are paragraphs 25,26, 28, 29, 30, and 39.

    **(g)  RICARDO SANCHEZ-GONZALEZ**-Particularly relevant is paragraph 39 of this proffer. Additionally, given the lack of any known ties this defendant has to the United States the risk of flight here is particularly high.